# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | |
|---|---|
| **ANTHONY FOSTER,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 6:22-cv-00096-RDP-HNJ** |
| | ) |
| **UNITED STATES FEDERAL** | ) |
| **GOVERNMENT,** | ) |
| | ) |
|     **Defendant.** | ) |

## MEMORANDUM OPINION

The Magistrate Judge entered a Report and Recommendation on August 20, 2024, recommending the dismissal of this action without prejudice under 28 U.S.C. § 1915A(b) for failing to state a claim upon which relief can be granted. (Doc. 14). Plaintiff Anthony Foster ("Foster") filed timely objections to the Report and Recommendation.[1] (Doc. 15).

**A.  Factual Background**

As set forth by the Magistrate Judge in his Report and Recommendation:

> On or around June 19, 2019, state authorities arrested Foster. (*See* Doc. 1 at 2). Foster contends the arresting officers assaulted him physically and sexually. (*See* Doc. 1 at 2). Following his arrest, Foster obtained photographs of an arresting officer sexually assaulting Foster with his hand inside Foster's pants touching Foster's anus and penis. (Doc. 1 at 2). Foster also obtained photographs of the arresting officers "twisting, punching, and stomping different parts of Foster['s]

---

[1] The Clerk of Court docketed Foster's objections on September 9, 2024. (*See* Doc. 15). However, under the "prison mailbox rule," because a prisoner proceeding *pro se* has virtually no control over the mailing of a pleading, the court deems the pleading filed at the time the prisoner delivers the pleading to prison or jail officials for mailing. *See Houston v. Lack*, 487 U.S. 266, 270-72 (1988); *Garvey v. Vaughn*, 993 F.2d 776, 783 (11th Cir. 1993) (extending "*Houston* to pro se prisoners filing complaints in section 1983 cases and claims under the Federal Tort Claims Act"). "Absent evidence to the contrary in the form of prison logs or other records," the court assumes a *pro se* prisoner delivered his pleading to prison authorities the day he signed it. *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001) (per curiam); *see also Taylor v. Williams*, 528 F.3d 847, 849 (11th Cir. 2008) (assuming *pro se* petitioner delivered his § 2254 habeas petition to prison authorities on the day he signed it). Foster dated his objections September 1, 2024. (*See* Doc. 15 at 4).

> body." (Doc. 1 at 2). This lawsuit centers around Foster's loss of these photographs and other evidence. (*See generally* Doc. 1; Doc. 12).
>
> On or around October 4, 2020, the Magistrate Judge assigned to Foster's then-pending federal criminal case ordered a mental evaluation of Foster. (*See* Doc. 1 at 2). JPATS assumed responsibility for transporting Foster to the Federal Medical Center ("FMC") in Devens, Massachusetts, for his mental examination. (Doc. 1 at 2, 3). U.S. Marshals Service Deputies took Foster to the airport in Birmingham, Alabama, to board the transport plane. (Doc. 1 at 3; *see also* Doc. 12 at 4). As Foster boarded the plane, an unidentified JPATS officer took Foster's legal documents and stated, "that shit[']s not going on this plane." (Doc. 1 at 2). A second unidentified JPATS officer informed the first JPATS officer "Foster was pretrial and his document[s] must be allowed to travel along with him." (Doc. 1 at 2). The first JPATS officer responded, "I don't give a fuck" and prevented Foster from taking the documents on the plane. (Doc. 1 at 2).
>
> Foster later contacted Jill Ellis, a U.S. Marshals Administrative Officer in the Northern District of Alabama, to locate the missing papers. (Doc. 1 at 2, 3). Foster communicated with Ellis three to four times verbally and via email. (Doc. 1 at 2). Ellis located Foster's papers, boxed them up, and mailed the box to Foster at FMC Devens. (Doc. 1 at 2, 8). Ellis personally placed the box in a United States postal worker's hands, and the box left the U.S. Marshals' office on January 15, 2021, at 10:44 a.m. (Doc. 1 at 8). Ellis sent Foster a photograph of the box via email. (Doc. 1 at 2). The box never reached Foster. (Doc. 1 at 2). Ellis believed sending the box via mail her best option as the FedEx Corporation ("FedEx") and the United Parcel Service, Inc. ("UPS") will not deliver packages to a Post Office Box. (Doc. 1 at 8).

(Doc. 14 at 5-6) (footnote omitted).

**B.     JPATS Officers**

Foster seeks $2.5 million in damages he argues resulted from the Justice Prisoner and Alien Transport System ("JPATS") officers' refusal to allow Foster's legal documents on the transport plane. (*See* Doc. 12 at 5). As the Magistrate Judge concluded in his Report and Recommendation:

> Foster's factual allegations establish the two JPATS officers did not cause Foster's alleged injury – the loss of his legal documents. Although one of the officers prevented Foster from taking his legal paperwork with him on the transport, his paperwork ended up at the U.S. Marshals Service's office where Jill Ellis later located them. (*See* Doc. 1 at 2). Pursuant to the foregoing precedent, Foster's claims against the two JPATS officers warrant dismissal for failure to state a claim upon which relief may be granted.

(Doc. 14 at 12). In his objections, Foster contends the JPATS officers must be held responsible for the loss of his legal documents "because it first began with them." (Doc. 15 at 2).

Section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation."[2] *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) (internal quotation marks and citations omitted). "Section 1983 thus focuses [the court's] inquiry on whether an official's acts or omissions were the cause - not merely a contributing factor - of the constitutionally infirm condition." *Id.* Common law tort principles of damages and causation apply in the § 1983 context. *See Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (Section 1983 "creates a species of tort liability" informed by tort principles regarding "damages and the prerequisites for their recovery" (internal quotation marks and citations omitted)); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986) ("[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts."); *Dixon v. Burke Cnty., Ga.*, 303 F.3d 1271, 1274-75 (11th Cir. 2002) ("The Constitution is the substantive fuel powering § 1983, but its mechanical structure is similar to the common law of Torts…As with any common law tort, Plaintiff must establish an adequate causal link between the alleged harm and the alleged unlawful conduct."); *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th

---

[2] As explained by the Eleventh Circuit:

> [S]uits under § 1983 and *Bivens* are very similar. A § 1983 suit challenges the constitutionality of the actions of state officials; a *Bivens* suit challenges the constitutionality of the actions of federal officials. The effect of *Bivens* was, in essence, to create a remedy against federal officers, acting under color of federal law, that was analogous to the section 1983 action against state officials. Thus, courts generally apply § 1983 law to *Bivens* cases.

*Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir. 1995) (per curiam) (internal quotation marks and citations omitted).

3

Cir. 2000) ("[W]e are guided by certain common law tort principles of damages and causation which apply in this § 1983 context." (citation omitted)).

> Under traditional tort principles, causation has two required elements: cause-in-fact and legal or proximate cause. A plaintiff must first show that the constitutional tort was a cause-in-fact of the injuries and damages claimed. To establish cause-in-fact, the plaintiff must show that except for the constitutional tort, such injuries and damages would not have occurred. Secondly, a plaintiff must show that the constitutional tort was the legal or proximate cause of the injuries and damages claimed. An act or omission is a legal or proximate cause of a plaintiff's injuries or damages if it appears from the evidence that the injury or damage was a reasonably foreseeable consequence of the act or omission.

*Jackson*, 206 F.3d at 1168 n.16 (citations omitted). Thus, "[f]or damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Id.* at 1168. *See also Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 431 (2017) ("Proper analysis of th[e] proximate cause question require[s] consideration of the 'foreseeability or the scope of the risk created by the predicate conduct,' and require[s] the court to conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged.'" (quoting *Paroline v. United States*, 572 U.S. 434, 444-45 (2014))).

> The connection between conduct and harm must be legally sufficient to satisfy notions of common fairness and policy. In other words, a physical causal relationship, although existing at some level, may still be too remote to fairly permit the imposition of civil liability. The causal relation does not exist when the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberate and autonomous decision-makers.

*Dixon*, 303 F.3d at 1275. *See also Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1166 (11th Cir. 2005) (concluding defendant's actions were not the proximate cause of plaintiffs' injuries where there was an independent intervening cause (citing *Dixon*, 303 F.3d at 1275)), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

With regard to the JPATS officers, the acts of various other parties unlink any causal connection between their conduct and the loss of Foster's legal papers. These acts include the following: U.S. Marshals taking Foster's papers back to their office in Birmingham; Jill Ellis's mailing of the papers to Foster; and *the postal service's subsequent loss of the papers*. These intervening free, independent, and volitional acts sever the causal connection between the JPATS officer's actions and the loss of Foster's paperwork.

Moreover, Foster's factual allegations relating to the JPATS officers simply do not support a reasonable inference that "someone who knew what [Foster's envelope] held inside" ordered the officers to confiscate Foster's documents. (*See* Doc. 15 at 2). First, the JPATS officers did not confiscate Foster's documents – rather, they would not permit him to take the documents on the plane. Second, the Marshals took Foster's papers back to their office in Birmingham and Jill Ellis mailed them to Foster. Nothing in the foregoing supports a reasonable inference state or federal authorities felt concern over the contents of Foster's documents and tried to destroy them as a result. Thus, Foster's objections relating to the dismissal of his claims against the JPATS officers warrant overruling.

**C.    Jill Ellis**

*1.    Foster's objections contain new factual allegations.*

Foster objects to this dismissal of his claims against Jill Ellis because he claims she did not act in good faith. (Doc. 15 at 1). Neither Foster's initial complaint nor his amended complaint set forth any such allegations. (*See* Doc. 1; Doc. 12). Foster's allegations against Jill Ellis in his initial *pro se* complaint follow:

> Foster later contacted Jill Ellis a[t] Birmingham, Alabama's Hugo Black Court House. Jill Ellis was contacted three to four times verbal[l]y and by email. She later state[d] she located the evidence and had boxed and personally mailed them

5

>   herself.  She also sent a photo in email of [the] box.  That box has never reach[ed] Foster.

(Doc. 1 at 2; *see also* Doc. 1 at 3-4, 8 (attachments to complaint relating to Jill Ellis)).  Foster's amended complaint, the operative complaint in this case, contains no factual allegations pertaining to Jill Ellis at all – her name appears only as a named defendant.  (*See* Doc. 12).  The August 20, 2024, Report and Recommendation informed Foster his "[o]bjections should not contain new allegations, present additional evidence, or repeat legal arguments."  (Doc. 14 at 16).   Foster's objections as to the dismissal of his claims against Jill Ellis warrant overruling on this basis. Even if the court were to consider Foster's newly asserted factual allegations, Foster fails to state a claim upon which relief can be granted.

>    2.    *Collateral estoppel precludes Foster's argument Jill Ellis did not act in good faith.*

The doctrine of collateral estoppel precludes Foster from asserting Jill Ellis did not act in good faith.  "Collateral estoppel, or issue preclusion, bars relitigation of an issue previously decided in judicial or administrative proceedings if the party against whom the prior decision is asserted had a 'full and fair opportunity' to litigate that issue in an earlier case."  *In re St. Laurent*, 991 F.2d 672, 675 (11th Cir. 1993) (quoting *Allen v. McCurry*, 449 U.S. 90, 95 (1980)).  Not only does collateral estoppel apply across civil matters, it can also "bar[ ] a defendant who is convicted in a criminal trial from contesting this conviction in a subsequent civil action with respect to issues necessarily decided in the criminal trial."  *United States v. Jean-Baptiste*, 395 F.3d 1190, 1194 (11th Cir. 2005) (citations omitted).  "For collateral estoppel to apply, the issue in question must be 'identical in both the prior and current action,' the issue must have been 'actually litigated' in the criminal trial, the determination of the issue must have been 'critical and necessary to the judgment in the prior action' and the burden of persuasion in the subsequent action cannot be

6

'significantly heavier.'"[3]  *Jean-Baptiste*, 395 F.3d at 1195 (quoting *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998) (per curiam)).

---

[3] Because actions brought pursuant to *Bivens* only require proof by a preponderance of the evidence standard, only the first two elements are at issue here.

> The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. 358, 370 [ ] (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.
>
> Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.
>
> In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt. *In re Winship, supra*.
>
> The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal," and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." *Woodby v. INS*, 385 U.S. 276, 285 [ ](1966). *See also* McCormick, Evidence § 320 (1954); 9 J. Wigmore, Evidence § 2498 (3d ed. 1940). One typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases. *See*, *e. g.*, *Woodby v. INS*, *supra*, at 285 [ ] (deportation); *Chaunt v. United States*, 364 U.S. 350, 353 [ ] (1960) (denaturalization); *Schneiderman v. United States*, 320 U.S. 118, 125, 159, [ ] (1943) (denaturalization).

*Addington v. Texas*, 441 U.S. 418, 423-24 (1979) (footnote omitted).

As this case involves a monetary dispute, Foster must prove his *Bivens* claims by a preponderance of the evidence. *See Addington*, 441 U.S. at 423-24. *See also Crawford-El v. Britton*, 523 U.S. 574, 594 (1998) (rejecting imposition of the clear-and-convincing-evidence burden on plaintiffs who assert § 1983 claims requiring proof of improper motive and stating "[n]either the text of § 1983 or any other federal statute, nor the Federal Rules of Civil Procedure, provide any support for imposing the clear and convincing burden of proof on plaintiffs either at the summary judgment stage or in the trial itself"); *Cuesta v. Sch. Bd. of Miami–Dade Cnty., Fla.*, 285 F.3d 962, 970 (11th Cir.2002) ("[I]n a § 1983 action, the plaintiff bears the burden of persuasion on every element." (citations omitted)). As the preponderance of the evidence stands as the least stringent burden of proof, the burden of proof in this action cannot be higher than the burden of proof in Foster's then-pending criminal case, regardless of what burden of proof applied to Foster's motion to dismiss his criminal indictment. *See Addington*, 441 U.S. at 423-24.

On December 9, 2022, the Magistrate Judge hearing pretrial matters in Foster's then-pending federal criminal case held an evidentiary hearing on Foster's motion to compel, which sought the production of eight categories of evidence; Foster's motion to suppress which challenged the validity of a search warrant executed on June 19, 2019; and Foster's motion to dismiss wherein Foster argued the indictment against him should be dismissed due to the loss of evidence Foster once possessed. *See United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 81 at 3 (N.D. Ala. Jan. 4, 2023).[4] As relayed in the Magistrate Judge's January 4, 2023, Report and Recommendation:

> The government's destruction or loss of evidence violates due process where the defendant shows "the evidence was likely to significantly contribute to his defense." *United States v. Revolorio-Ramo*, 468 F.3d 771, 774 (11th Cir. 2006). The evidence must have possessed "an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Brown*, 9 F.3d 907, 910 (11th Cir. 1993) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). If the destroyed evidence was not clearly exculpatory but only "potentially useful," a defendant must show that the government acted in bad faith in order to establish a due process violation. *Arizona v. Youngblood*, 488 U.S. 51, 57-58, (1988).

*United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 81 at 14 (N.D. Ala. Jan. 4, 2023).  Thus, to rule on Foster's motion to dismiss, the Magistrate Judge had to determine whether Foster's missing documents were exculpatory in nature. The Magistrate Judge also addressed whether the government acted in bad faith.

The Magistrate Judge concluded Foster's lost documents did not constitute exculpatory evidence, and Foster failed to prove the government acted in bad faith. *United States v. Anthony*

---

[4] The court takes judicial notice of *United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1 (N.D. Ala. filed Jan. 29, 2020), available at https://pacer.uscourts.gov/.  *See United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts." (citing *ITT Rayonier, Inc. v. United States*, 651 F.2d 343, 345 n.2 (5th Cir. Unit B 1981))).

8

*Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 81 at 15-19 (N.D. Ala. Jan. 4, 2023). On April 24, 2023, the court overruled Foster's objections, adopted the Magistrate Judge's report, accepted the Magistrate Judge's recommendations, and denied Foster's motions. *United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 104 (N.D. Ala. Apr. 24, 2023). The court specifically found Foster's "papers were lost only because the Marshals were attempting to reunite Foster with his paperwork and trusted that the United States Postal Service would safely deliver the papers to him." *United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 104 at 5 (N.D. Ala. Apr. 24, 2023). The court further found: "Given her intent to reunite Foster with his evidence and the COVID-19 restrictions in place when she mailed the package, the court agrees with the magistrate judge that [Jill] Ellis acted reasonably under the circumstances." *United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 104 at 5 (N.D. Ala. Apr. 24, 2023).

Foster later moved to compel the production of video surveillance from the United States Marshal's Service office in the Hugo L. Black courthouse arguing the lost documents the Marshals described at the evidentiary hearing on Foster's pretrial motions were either tampered with or not Foster's missing documents. *See United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 110 (N.D. Ala. May 15, 2023). The court found "nothing at the hearing suggested Foster's documents were tampered with." *United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 110 at 1 (N.D. Ala. May 15, 2023). The court also noted it previously found "the [M]arshals credibly explained why they lost the documents and demonstrated that they did not act in bad faith." *United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 110 at 1 (N.D. Ala. May 15, 2023). Foster ultimately pleaded guilty, and the court sentenced Foster on February 20, 2024. *See United States v. Anthony*

*Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 166 (N.D. Ala. Feb. 20, 2024).  Foster did not appeal the district court's judgment and conviction.

The court finds collateral estoppel precludes Foster's argument Jill Ellis acted in bad faith. This issue was actually litigated, was necessary to the determination of Foster's motion to dismiss his then-pending federal indictment, and Foster had a full and fair opportunity to litigate the issue in his prior criminal proceeding.

In addition, the court's denial of Foster's motion to dismiss provided sufficient indicia of finality for collateral estoppel to apply – the court considered a wide range of evidence from concerned parties, entered a substantial order explaining the court's findings, and gave no indication it considered its ruling as any less than final.  *See In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1253 (11th Cir. 2006) ("[C]ollateral estoppel requires sufficient indicia of finality, but does not require the 'final judgment' needed for res judicata to apply.") (citing *Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000)); *Christo*, 223 F.3d at 1339 ("It is widely recognized that the finality requirement is less stringent for issue preclusion than for claim preclusion." (citations omitted)); *Powrzanas v. Jones Util. Contracting Co. Inc.*, 822 F. App'x 926, 929 (11th Cir. 2020) (unpublished)[5] (per curiam) (affirming district court's dismissal of plaintiff's § 1985(2) claims as barred by issue preclusion where the dispositive issue was identical to the issue presented in plaintiff's two motions for a restraining order in a prior case; the issue was actually litigated in the prior case though briefs and two evidentiary hearings; the issue was a critical and necessary part of the court's orders denying the motions in the prior case; and plaintiff had a full and fair opportunity to litigate the issue in the prior case); *Powrzanas v. Jones Util. Contracting Co. Inc.*,

---

[5] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

No.: 2:18-CV-1931-MHH, 2019 WL 6790587, at *2 (N.D. Ala. Dec. 12, 2019) (dismissing plaintiff's § 1985 conspiracy claim because plaintiff's § 1985 claim raised the same factual issue previously decided by a magistrate judge in two motions for a restraining order brought in a prior action – the plaintiff could not relitigate the factual findings from the prior action).

Even if the orders entered in Foster's then-pending federal criminal case did not contain sufficient indices of finality for purposes of collateral estoppel, the relevant orders stand final now. "When a district court enters a final judgment *all* prior non-final orders and rulings which produced the judgment are merged into the judgment and subject to review on appeal." *United States v. B.G.G.*, 53 F. 4th 1353, 1365 (11th Cir. 2022) (emphasis in original) (quoting *Akin v. PAFEC Ltd.*, 991 F.2d 1550, 1563 (11th Cir. 1993)). Foster ultimately pleaded guilty to the federal charges pending against him, and the court sentenced Foster on February 20, 2024. *See United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 166 (N.D. Ala. Feb. 20, 2024). As such, the court's adjudication of Foster's motion to dismiss, if not final at the time of adjudication, became final upon the issuance of the February 20, 2024, Judgment in a Criminal Case. *See B.G.G.*, 53 F. 4th at 1365 ("The good-faith finding was final and appealable because it merged - like *all* of the district court's prior orders - into the final dismissal order." (emphasis in original)). Again, Foster did not file an appeal in his criminal case. Thus, the doctrine of collateral estoppel or issue preclusion prohibits Foster from relitigating whether Jill Ellis acted in good faith.

    3.    *Foster mischaracterizes the evidence presented in his then-pending federal criminal case.*

Even if collateral estoppel does not preclude Foster from arguing Jill Ellis acted in bad faith, Foster's objections are due to be overruled because he mischaracterizes the evidence presented at the evidentiary hearing in his then-pending federal criminal case.

11

As relayed in the Magistrate Judge's January 4, 2023, Report and Recommendation entered in Foster's criminal case:

> [O]n October 13, 2020, the undersigned ordered Foster to undergo a competency evaluation. (Doc. 26). On November 5, 2020, Foster was transported from state custody to the cell block in the United States Marshals Office for the Northern District of Alabama on the second floor of the Hugo Black Courthouse in Birmingham, Alabama. Foster had a ten- to twelve-inch-tall bundle of what he described as "legal paperwork" with him when he arrived. Deputy United States Marshal Josh Shearer checked the paperwork for contraband but did not read it.
>
> The same day, Deputy United States Marshals Josh Shearer and Jason Boehm transported Foster to the Birmingham-Shuttlesworth Airport to be flown to FMC Devens in Boston, Massachusetts, where the competency evaluation would be conducted. Shearer took Foster from the cell block to the courthouse basement, placed Foster's paperwork in the trunk of the transport vehicle, and drove him to the airport. When they arrived, they drove to an access control gate in the private flights area of the airport to transfer Foster to the custody of the Justice Prisoner and Alien Transport System ("JPATS"), which operated the flight. Shearer testified he retrieved Foster's documents from the trunk and had Foster approach the plane with the documents. However, a JPATS officer refused to permit Foster to take the documents on the plane. Shearer and Boehm transferred Foster to JPATS custody, placed the paperwork back in the trunk, and returned to the Hugo Black Courthouse. Shearer could not recall which officer brought the paperwork back to the courthouse, but he testified that when property is brought up it is generally placed on a wooden desk in the USMS Office. Shearer testified he neither added to nor took away from the stack of documents and that he never saw the documents again.
>
> On January 14, 2021, Jill Ellis, the Administrative Officer for the United States Marshals Service for the Northern District of Alabama, received a phone call from Laura Sanders, a case worker with the Federal Bureau of Prisons ("BOP") at FMC Devens. Sanders stated she was trying to assist Foster in locating documents. Foster was on speakerphone in Sanders' office during the call. Foster indicated he was looking for an envelope of "court papers" which he had not been allowed to take on the transport flight. Sanders pulled the docket report for this case and asked Foster what papers he was looking for. Foster stated he wanted "all of it," but all of the information on the docket report was not printable. Foster did not mention wanting photographs or anything other than "court papers."
>
> Ellis looked through the USMS office that afternoon and discovered a large manila envelope. She opened it and fanned through the papers to see if it could be the missing paperwork. Once she saw Foster's name, she assumed the envelope contained the missing "court papers." Ellis saw nothing other than documents, but she did not review the envelopes contents beyond fanning through them. Usually, the USMS would provide a person seeking items in its possession with two options:

> (1) have a family member pick up the items or (2) have the defense attorney pick them up. However, its office was closed to the general public due to COVID-19 concerns. Based on this, Ellis decided to box the documents up and ship them to FMC Devens.
>
> BOP does not allow shipments from FedEx or other courier services, so Ellis sent the box via the United States Postal Service ("USPS"). Ellis elected to use media mail because it was cheaper. She weighed the box, addressed it to the address provided by Sanders, printed out the postage, and personally put the box in the postal carrier's hands. She also took a photograph of the box, which she emailed to Sanders on January 15, 2021. (Gov't Exh. 1). In this email, Ellis indicated she had found Foster's papers and had mailed them via "book rate" to FMC Devens, personally delivering the box to the postal carrier.
>
> On February 4, 2021, Sanders emailed Ellis indicating that the box had not yet arrived. Ellis replied that the box had been sent out and provided the meter number. Ellis had no further contact with Sanders, and the box never arrived.

*United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 81 at 6-8 (N.D. Ala. Jan. 4, 2023) (footnotes omitted).

This excerpt from the Magistrate Judge's Report and Recommendation shows that Foster's objections mischaracterize the evidence presented at the evidentiary hearing. Foster argues Jill Ellis did not act in good faith because (1) the photographs of the box Jill Ellis mailed Foster did not exhibit any identifying marks indicating the owner or the mailing address; (2) Jill Ellis provided Foster a "fake" tracking number; (3) Jill Ellis testified she found Foster's documents in a torn envelope, and Foster contends "there would be no reason to put one legal envelope inside of a box"; and (4) based upon the federal agent's testimony relating to the dimensions of Foster's documents (a 12-to-15 inch vertical thickness), Foster's documents would not fit in the box depicted in the photographs. (Doc. 15 at 1).

As to Foster's first contention, while blurry and unreadable, the photograph of the box mailed to Foster appears to have a mailing address. *See United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 78-1 (N.D. Ala. Dec. 12, 2022). As to Foster's second

contention, Jill Ellis did not provide a "fake" tracking number – she provided a meter number, akin to a receipt number. *See United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 81 at 8 (N.D. Ala. Jan. 4, 2023). (*See also* Doc. 1 at 8 (Jill Ellis's explanation "the meter number was 062S0011402634 media rate")). As to Foster's third contention, Jill Ellis's decision to mail Foster's papers to him in a box does not support a reasonable inference the documents in the box were not Foster's missing documents. (*See* Doc. 15 at 1). Finally, the federal agent testified Foster's legal paperwork stood ten- to twelve-inches tall, not twelve- to- fifteen inches tall. *See United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 81 at 6 (N.D. Ala. Jan. 4, 2023). *See also United States v. Anthony Cornelius Foster*, No. 4:20-cr-00029-CLM-JHE-1, ECF 82 at 18 (N.D. Ala. Jan. 13, 2023) (Josh Shearer's testimony agreeing Foster had "10 to 12 inches worth of legal paperwork in his possession" prior to boarding the JPATS transport plane). Thus, Foster's contention the federal agent's testimony establishes the box did not contain Foster's missing documents because the documents could not have fit in the box lacks merit.[6] In short, Foster's factual allegations do not support a reasonable inference Jill Ellis tampered with, intentionally destroyed, or failed to mail Foster's paperwork.

    *4.    Jill Ellis's purportedly negligent actions do not state a due process violation.*

To the extent Foster argues Jill Ellis broke protocol when she mailed Foster's documents to him via media mail (*See* Doc. 15 at 3), that assertion misses the mark. An official does not violate due process when the official's negligent actions or inactions cause an unintended loss of or injury to life, liberty, or property. *Daniel v. Williams*, 474 U.S. 327, 330-31, 335-36 (1986) (overruling *Parratt v. Taylor*, 451 U.S. 527 (1981) "to the extent that it states that mere lack of

---

[6] Of course, these were all matters that were at issue, or reasonably could have been put at issue, in Foster's criminal matter.

due care by a state official may 'deprive' an individual of life, liberty, or property under the Fourteenth Amendment").

Thus, Foster's objections as to the dismissal of his claims against Jill Ellis warrant overruling.

**D.     The D.A.**

Foster contends "the D.A. is the overseer" of the parties "who broke protocol." (Doc. 15 at 4). In a *Bivens* action, "supervisory officials may not be held liable for acts of their subordinates based merely on a theory of respondeat superior or vicarious liability." *Rice v. Sixteen Unknown Fed. Agents*, 658 F. App'x 959, 961 (11th Cir. 2016) (unpublished) (per curiam) (citing *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."); *Ziglar v. Abbasi*, 582 U.S. 120, 141 (2017) ("*Bivens* is not designed to hold officers responsible for acts of their subordinates." (citing *Iqbal*, 556 at 676)).

"Supervisors may, however, be held liable 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'" *Rice*, 658 F. App'x at 961 (quoting *Gonzalez*, 325 F.3d at 1234). "To demonstrate a causal connection, a plaintiff must show either that (1) the supervisor was put on notice, by a history of widespread abuse, of the need to correct the alleged deprivation, but failed to do so; (2) the supervisor's policy or custom resulted in deliberate indifference; (3) the supervisor directed subordinates to act unlawfully; or (4) the supervisor knew that subordinates would act unlawfully and failed to intervene." *Id.* (citing *Gonzalez*, 325 F.3d at 1234).

Foster alleges no facts portraying "the D.A." participated personally in any of the purported constitutional violations Foster asserts. (*See* Doc. 1; Doc. 12; Doc. 15). Furthermore, Foster alleges no facts establishing a plausible causal connection between the acts of "the D.A." and the alleged unconstitutional acts of his or her subordinates. (Doc. 1; Doc. 12; Doc. 15). Moreover, "there can be no supervisory liability . . . if there was no underlying constitutional violation." *Green v. Hooks*, 798 F. App'x 411, 427 (11th Cir. 2020) (unpublished) (per curiam) (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019)). As discussed in the preceding sections, Foster failed to state a claim the JPATS officers or Jill Ellis violated his constitutional rights. Therefore, his supervisory-liability claims against "the D.A." cannot stand, and any claims against the D.A. warrant dismissal. *See id*. Thus, Foster's objections relating to the dismissal of his claims against the D.A. warrant overruling.

**E.     Purported Constitutional Violations**

Foster further contends the defendants violated his right to a fair trial, his right to equal protection of the laws, and his right to be free from cruel and unusual punishment. (*See* Doc. 15 at 1-2).

   *1.     Right to a Fair Trial*

In his objections, Foster contends "he is being denied the right to a fair trial." (Doc. 15 at 1; *see also* Doc. 15 at 4 (Foster stating he "believes it is up to [a] jury of my peers to hear and choose if I deserve compensation")). Presumably, Foster is referring to the Magistrate Judge's recommendation the court *sua sponte* dismiss Foster's complaint prior to service and without an evidentiary hearing. But, Foster has no right to a hearing prior to the dismissal of his complaint as "[d]ue process does not always require notice and the opportunity to be heard before dismissal." *See Vanderberg v. Donaldson*, 259 F.3d 1321, 1324 (11th Cir. 2001) (finding no due process

violation where "the district court reviewed the magistrate judge's report and recommendation de novo" and plaintiff "was given an opportunity to object to the magistrate judge's report before the district court entered its final order"). Thus, Foster's objections on this basis are due to be overruled.

To the extent Foster argues the loss of his documents violated his right to due process because the loss adversely affected his right to defend himself at his criminal trial, his claims are without merit. (*See* Doc. 15 at 2). *See Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir. 1995) (per curiam). Judgment in Foster's favor on this claim would necessarily imply the invalidity of his conviction. (*See* Doc. 15 at 2). Because Foster's federal convictions have not been invalidated, his claim for damages does not yet stand ripe. *See Abella*, 63 F.3d at 1065. Thus, Foster's objections relating to purported due process violations in his underlying federal criminal proceeding warrant overruling.

To the extent Foster argues the loss of his documents adversely affected his right to bring a civil action against the officers who arrested him, Foster's objections are due to be overruled. Foster's claims against the arresting officers are currently before this court in *Anthony Foster v. Kevin Hassell, et al.*, No. 4:19-cv-01928-CLM-HNJ (N.D. Ala. filed Nov. 25, 2019).[7] (*See also* Doc. 12 at 9).

   *2.     Equal Protection*

To succeed on an equal protection claim, Foster must show he stands similarly situated to others who received more favorable treatment, and defendants based their putative discriminatory

---

[7] The court takes judicial notice of *Anthony Foster v. Kevin Hassell, et al.*, No. 4:19-cv-01928-CLM-HNJ (N.D. Ala. filed Nov. 25, 2019), available at https://pacer.uscourts.gov/. *See United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts." (citing *ITT Rayonier, Inc. v. United States*, 651 F.2d 343, 345 n.2 (5th Cir. Unit B 1981))).

treatment on a constitutionally protected characteristic. *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001) (per curiam) (citing *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986) (per curiam)).  The Equal Protection Clause also recognizes a cause of action on behalf of a "class of one" where the plaintiff does not constitute a member of a protected class or group.  *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1201 (11th Cir. 2007).  A class of one claim asserts an official has "intentionally treated [a plaintiff] differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Lieb v. Hillsborough Cnty. Public Trans. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) (quotation marks and citations omitted). To establish a class of one claim, Foster must prove the defendants: (1) treated him differently from other similarly situated individuals, and (2) unequally applied a facially neutral rule for the purpose of discriminating against him.  *Id.* at 1307 (citations omitted).

Regardless of whether Foster attempts to proceed with a normal equal protection case, or with a class of one claim, he has failed to state a claim upon which relief can be granted because he does not allege the JPATS officers allowed other pretrial detainees to bring their documents on a transport plane or that Foster stood similarly situated to other pretrial detainees who were permitted to travel with their documents. (*See* Doc. 1; Doc. 12; Doc. 15).  Because Foster failed to allege facts showing the defendants treated similarly situated individuals more favorably, his equal protection claims warrant dismissal for failure to state a claim upon which relief can be granted.

   3.   *Cruel and Unusual Punishment*

To the extent Foster argues the loss of his documents constitutes cruel and unusual punishment, his objections are due to be overruled.  (*See* Doc. 15 at 1-2).  At all times relevant to Foster's claims in this action, Foster was a pretrial detainee awaiting trial on federal and state

criminal charges. (*See generally* Doc. 1). The due process clause governs the treatment of arrestees or pretrial detainees in custody while the Eighth Amendment's prohibition on cruel and unusual punishment governs the treatment of convicted prisoners. *See Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1572 (11th Cir. 1985) (citations omitted).

To the extent the due process clause incorporates the prohibition on cruel and unusual punishment, the Supreme Court in *Estelle v. Gamble* recognized the "primary concern" of the drafters of the Eighth Amendment "was to proscribe tortures and other barbarous methods of punishment." 429 U.S. 97, 102 (1976) (alterations adopted) (internal quotations marks and citations omitted). In *Estelle*, the Supreme Court further recognized "the [Eighth] Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Id.* (internal quotation marks and citation omitted). Foster's factual allegations do not support an inference any named defendant violated the Eighth Amendment's proscription against cruel and unusual punishment. (*See* Doc. 1; Doc. 12; Doc. 15).

**F.     Purportedly Misleading Advice by the Court**

Foster incorrectly contends he "was advise[d] to file a Bivens claim by the court." (Doc. 15 at 3). Presumably, Foster is referring to the Magistrate Judge's July 12, 2022 Order to Amend. (*See* Doc. 11). The Magistrate Judge did not advise Foster to file a claim under *Bivens*. (*See* Doc. 11). Rather, the Magistrate Judge informed Foster what he must do to state a claim under *Bivens* and what he must do to state a claim under the Federal Tort Claims Act. (*See* Doc. 11 at 1-2). Foster chose to file his claims under *Bivens*. (*See* Doc. 12).

After careful consideration of the record in this case, the Magistrate Judge's Report and Recommendation, and Foster's objections, the court **ADOPTS** the Report and **ACCEPTS** the

recommendation. Consistent with that recommendation and 28 U.S.C. § 1915A(b), this action is due to be dismissed without prejudice for failing to state a claim upon which relief can be granted.

A final judgment will be entered.

**DONE** and **ORDERED** this October 7, 2024.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE